UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**LAURETTE BAGE**, an individual,

    Plaintiff,

–vs–

Case No.
Hon.

**U.S. LAB & RADIOLOGY, INC. d/b/a U.S. LABORATORIES**, a foreign corporation, **SYMPHONY DIAGNOSTIC SERVICES NO. 1, INC. d/b/a MOBILEXUSA** and **MOBILEX USA**, a foreign corporation, and **TRIDENTUSA MOBILE INFUSION SERVICES, LLC**, a foreign corporation,

    Defendants.

---

**DEBORAH GORDON LAW**
**Deborah L. Gordon (P27058)**
**Benjamin I. Shipper (P77558)**
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
248-258-2500/FAX 248-258-7881
dgordon@deborahgordonlaw.com
bshipper@deborahgordonlaw.com

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff **Laurette Bage**, by and through her attorneys, **Deborah Gordon Law**, for her Complaint and Demand for Jury Trial against Defendants **U.S. Lab & Radiology, Inc. d/b/a U.S. Laboratories**, Symphony Diagnostic Services, No.

1

**1, Inc. d/b/a MobilexUSA** and **Mobilex USA**, and **TridentUSA Mobile Infusion Services, LLC**, states as follows:

**PARTIES AND JURISDICTION**

1.      This is an action for wrongful discharge in violation of Michigan public policy arising out of Plaintiff's employment relationships with Defendant U.S. Lab & Radiology, Inc. d/b/a U.S. Laboratories ("U.S. Labs"), Symphony Diagnostic Services, No. 1, Inc. d/b/a MobilexUSA and Mobilex USA ("Mobilex"), and TridentUSA Mobile Infusion Services, LLC ("Trident").

2.      Plaintiff **Laurette Bage** is an individual domiciled in State of Michigan. Her sole residence is in Michigan and has been for several years.

3.      Defendant **U.S. Labs** is a foreign corporation doing business in this District, but is incorporated in the State of Delaware and maintains its principal place of business in the State of Massachusetts.

4.      Defendant **Mobilex** is a foreign corporation doing business in this District, but is incorporated in the State of Delaware and maintains its principal place of business in the State of Maryland.

5.      Defendant **Trident** is a foreign corporation doing business in this District, but is incorporated in the State of Delaware and maintains its principal place of business in the State of Maryland.

6.     Defendants will herein collectively be referred to as "Defendants" unless more specifically referred to individually.

7.     This Court has subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship amongst the parties and the amount in controversy is greater than $75,000.00.

8.     This Court has personal jurisdiction over Defendants because they do business and can be found within this District.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants may be found within this District, and the events giving rise to this Complaint occurred in this District; namely, Plaintiff was employed and terminated, as well as mitigated, in this District.

## STATEMENT OF FACTS

10.     At all times relevant to this claim, U.S. Labs, Mobilex, and Trident employed Plaintiff.

11.     U.S. Labs performs medical diagnostic testing, offering mobile phlebotomy, laboratory, Digital Radiography and EKG testing services.

12.     Mobilex performs bedside mobile imaging of x-ray, ultrasound, electrocardiogram, and other ancillary services.

13.     Trident performs bedside diagnostics, laboratory services, and hospice care.

3

## Plaintiff's Work History with Defendants

14.     Prior to working for Defendants, Plaintiff worked at ADS, which is, upon information and belief, a subsidiary of Defendants.

15.     At ADS, Plaintiff supervised ultrasound technologists and was in charge of balancing that department's budget.

16.     In or around December 2012, Plaintiff began working for Defendants as a regional Director of Radiology Operations.  This change reflected Plaintiff's strong performance and advancement with Defendants.

17.     In this role, Plaintiff continued to supervise ultrasound technologists and maintained the associated budgets, and she added the responsibility of supervising and scheduling X-ray technologists and took on budgetary responsibilities relative to their work.

18.     When Plaintiff began her employment with Defendants, Plaintiff reported directly to Jeff Hooper, who Defendants employed as Regional Vice President and General Manager.

19.     In or around November 2014, Plaintiff again advanced due to strong performance, this time gaining new responsibilities, including overseeing the phlebotomy laboratory operations department and maintaining the profit and loss statements for the Southfield, Michigan market.

4

20.    The phlebotomy laboratory operations department was divided in to two sections: the external operations section, in which phlebotomy staff collected and processed laboratory specimens from patients in the field, and returned the specimens to the lab for processing and testing; and the internal operations section, in which technical staff processed and tested the specimens.

21.    In or around November 2014, Theresa Mwimbwa, whom Defendants employed as a phlebotomy supervisor, reported directly to Plaintiff for the external operational section of the phlebotomy department.

22.    At the same time, Mwimbwa reported directly to Shirley Johnson, Lab Manager for Defendants, relating to the internal operations section of the phlebotomy department.

23.    On or around December 22, 2014, Hooper praised Plaintiff's management of the operations section of the phlebotomy department, stating:

> Your success is proof that this part of the business should not be supervised by the Lab Manager. It is too different from the internal workings of the lab, and it is much more aligned with what you do.
>
> Keep up the great work.

24.    On or around February 13, 2015, Plaintiff's title changed to Area Manager, as her position as Director of Radiology Operations was eliminated.

25.    As Area Manager Plaintiff continued her same job responsibilities as when she was regional Director of Radiology Operations, except that she now had

5

a "dotted-line" supervisory role with respect to ultrasound technologists. Plaintiff's role as a "dotted-line" supervisor was never explained to Plaintiff, but again was presented as an advancement in terms of additional responsibility.

26.     At both ADS and Defendants, Plaintiff was entitled to incentive-based compensation for achieving individual performance targets in addition to her yearly salary.

Plaintiff's incentive-based compensation continued in her role as Area Manager.

27.     As set forth more fully below, Plaintiff received a bonus payment pursuant to her incentive-based compensation plan for the second quarter of 2015, shortly before being terminated for supposedly poor performance.

**Plaintiff Reports Defendants' Mileage Fraud to Defendants**

28.     During her time working for Defendants, Plaintiff had reported several compliance issues.

29.     Mileage driven by Defendants' employees using Defendants' vehicles to work-sites is a reimbursable expense that is paid by Medicare, Medicaid, and private insurances to Defendants.

30.     At least as of November 2014, technologists would, after driving to a work-site, intentionally record on their mileage logs a number of miles that was well in excess of those actually driven.

31.     These incorrect logs had the effect of fraudulently billing Medicare, Medicaid, and private insurances in excess of amounts to which Defendants were entitled.

32.     Besides When Plaintiff learned of this fraud, Plaintiff opposed the unlawful action, refusing to participate in approving the mileage, and instructing the technologists to cease recording false mileage logs.

33.     Plaintiff subsequently opposed and objected to this mileage fraud to Hooper.

34.     In response, Hooper instructed Plaintiff to disregard the fraudulent mileage logs and to "focus on other things."

35.     When Hooper failed to take action to remedy the fraudulent billing, Plaintiff further opposed the fraud by reporting it, and Hooper's refusal to stop the fraud, to Jardine and to Defendants' billing department.

### Plaintiff Reports Defendants' Unsafe Use of a Mobile Phlebotomy Van to Defendants

36.     In addition, in or around January 2015, Plaintiff discovered that one of Defendants' repair technicians had modified one of Defendants' vans to create a mobile laboratory for processing blood drawn by phlebotomists.

37.     Upon information and belief, the goal of the mobile laboratory van was to save on transportation time and costs by processing blood samples while driving to the next blood-draw location.

7

38.    Immediately, Plaintiff recognized that the instruments used in the mobile laboratory van and the method by which blood was being processed was inherently unsafe and in violation of many safety regulations.

39.    For example, the mobile laboratory van contained:

a.    a laminated shelf that had simply been bolted against a wall in the back of the van;

b.    centrifuges that had been bolted on to the laminated shelf;

c.    no place to dispose of needles or other sharps;

d.    one captain's chair from a different model van, which had been bolted to the van's floor on plywood, and which was located in the center of the rear of the van;

e.    a dorm-style refrigerator on the van's floor for keeping samples cold, and which contained no locking mechanism, allowing it to swing open and spill its contents; and

f.    an after-market power converter, which derived electricity from after-market wiring drilled through the van's floor to the van's main battery, for the purpose of powering the refrigerator and centrifuges, both of which were plugged in to after-market surge protectors.

40.     Plaintiff reported these safety violations to Hooper for the first time in January 2015.

41.     In response, Hooper stated that he had instructed the technicians to construct the mobile laboratory van.

42.     Sometime after January 2015, a second van arrived which was similarly inherently unsafe and in violation of many safety regulations.

43.     Plaintiff reiterated her concerns with the unsafe mobile laboratory vans and the practice of exposing staff to unsecured sharps and blood products to Hooper multiple times between January and April 2015.

44.     Hooper responded by insisting that the mobile phlebotomy vans be kept operational to process blood samples while driving.

45.     During this time period, to prevent the mobile phlebotomy vans from being used for processing blood samples while driving, Plaintiff intervened by 1) scheduling maintenance of the mobile phlebotomy vans and 2) restricting usage of the mobile phlebotomy vans for transportation of employees, only, which also saved on mileage reimbursement to employees using their personal automobiles to travel to blood-draw sites.

46.     Despite Hooper insisting otherwise and as a result of Plaintiff's intervention, the mobile phlebotomy vans were not used to process blood while driving while Plaintiff was employed by Defendants.

9

47.    Hooper often expressed to Plaintiff his frustration that the mobile phlebotomy vans were not yet operational to process blood while driving.

48.    Eventually the mobile phlebotomy vans were used to process blood when parked at a blood draw site.

49.    Plaintiff and Mwimbwa objected to Hooper about the mobile phlebotomy vans' use to process blood when parked at a blood draw site because the technicians failed to comply with health and safety regulations, such as wearing goggles.

50.    Throughout this time period, Hooper continued to insist that each of the mobile phlebotomy vans be utilized by two of Defendants' employees—the first to drive the van and the second to process blood while the van was being driven.

51.    Hooper continued to express his frustration to Plaintiff that the mobile phlebotomy vans were not yet available for this purpose.

52.    Plaintiff escalated the objections regarding the mobile laboratory vans to Joseph Jardine, Vice President of Human Resources and Hooper's supervisor, repeatedly between February and June 2015.

53.    Around June 2015, Jardine, whose office is based in Maryland, visited Plaintiff's Southfield, Michigan office and, after seeing one of the mobile

laboratory vans, agreed with Plaintiff that it was unsafe, dangerous, and should not be utilized by Defendants.

## Plaintiff Supported Other Employees Who Reported
## Compliance and Safety Violations and Who Were Also Terminated

54.    Beginning in June 2015, Mwimbwa and other members of the phlebotomy department reported compliance violations directly to Jardine and Pippa Akem, Compliance and Privacy Manager for Defendants.

55.    Specifically, Mwimbwa reported that Defendants' blood-draw procedure violated Defendants' and Medicare's regulations because phlebotomists drew blood from patients:

   a. pursuant to requisitions that omitted signatures from doctors of registered nurses;

   b. pursuant to requisitions that were either unsigned completely, or were signed by a licensed practical nurse; or

   c. pursuant to requisitions that omitted a diagnosis code.

56.    In addition, Mwimbwa reported to Ms. Akem that diagnosis codes were often written after blood had been drawn, and that such diagnosis codes were written for testing related to long-term medication, for which Medicare, Medicaid, and Blue Cross-Blue Shield paid the highest reimbursement rates.

57.    Mwimbwa further advised Ms. Akem that falsification of diagnosis codes violated multiple federal and state regulations, and could constitute fraud

against the federal government if the diagnosis code "made-up" is one that charges a higher rate than the patient's diagnosis for which the blood was actually tested.

58.   Mwimbwa also advised Ms. Akem that:

    a.   That Defendants' employees kept blood samples in vials without caps and in cardboard boxes, in violations of health and safety standards.

    b.   That Defendants' employees kept blood samples that required refrigeration in a refrigerator along with food, including the employees' lunches, also in violation of health and safety standards.

59.   After Mwimbwa reported the aforementioned compliance violations to Ms. Akem—

    a.   Hooper berated Plaintiff and Mwimbwa and instructed them to not report any violations to compliance.

    b.   Hooper removed Plaintiff as Mwimbwa's director supervisor with respect to the external operational aspects of the phlebotomy laboratory operations department, and made Ms. Johnson Plaintiff's sole supervisor.

60.     On or around August 18, 2015, Hooper told Plaintiff that Mwimbwa had been a bad employee and that Mwimbwa's employment had been terminated with Defendants.

61.     Plaintiff responded to Hooper that Mwimbwa was not a bad employee and that Mwimbwa and the other phlebotomy technologists had properly reported valid compliance concerns and should be supported, not terminated.

62.     The very next day, on or around August 19, 2015, Defendants, in a letter signed by Hooper, terminated Plaintiff's employment for "unsatisfactory job performance."

63.     On the contrary, Plaintiff's performance with Defendants had been satisfactory or better at all times, and her performance was not the reason for the termination.

64.     Other than with respect to the above protected activities, Plaintiff never received any negative feedback in her role as Area Manager whatsoever and indeed, as set forth above, she had received an incentive-based bonus for the second quarter of 2015.

## The Numbers on which Plaintiff's Compensation Was Based Were Improperly Manipulated

65.     Beginning in December 2014, Plaintiff suspected that her profit and loss numbers, on which her incentive-based compensation was based, had been improperly manipulated.

13

66.    Plaintiff asked Defendants' finance department about whether the profit and loss numbers were correctly reported.

67.    Defendants' finance department informed Plaintiff that multiple Laboratory responsibilities under the supervision of Ms. Johnson, including the salaries of several lab couriers and their commissions, had been included in Plaintiff's profit and loss calculations.

68.    At the time, the Laboratory duties for which Ms. Johnson was responsible had poor performance numbers.

69.    These erroneous calculations had the effect of making Ms. Johnson's performance looks better than it actually was; making Plaintiff's performance look less good than it actually was; and denying Plaintiff the correct incentive-based compensation to which she was entitled.

## COUNT I
## Wrongful Discharge in Violation of Michigan Public Policy

70.    Plaintiff realleges all prior paragraphs as if they were fully set forth herein.

71.    During her employment with Defendants, Plaintiff failed and refused to violate laws, statutes, regulations and/or rules promulgated pursuant to law, and refused to acquiesce in Defendants' violations of laws, statutes, regulations, and/or rules promulgated pursuant to law.

14

72.     In particular, Plaintiff failed and refused to violate or acquiesce in, or reported, violations of laws governing the standards of care for occupational health and environment controls related to mobile phlebotomy vans and properly billing mobile phlebotomy services via Medicare and Medicaid.  Plaintiff further failed and refused to violate or acquiesce in retaliating against employees who reported suspected violation of laws, an activity that is protected under State law.

73.     Plaintiff's termination was in retaliation for her failure and refusal to violate or acquiesce in, or reporting of, these violations of law.

74.     Plaintiff's treatment and termination violated the clearly established public policy of the State of Michigan, i.e., that an employer may not discharge an employee because she fails or refuses to violate the law, or reports violations of the law, in the course of employment.

75.     The actions of Defendants, their agents, representatives, and employees were intentional, wanton, willful, malicious and taken in bad faith, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Plaintiff.

76.     As a direct and proximate result of those actions, the terms, conditions and privileges of Plaintiff's employment were adversely affected, and Plaintiff was unlawfully terminated.

77.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered injuries and damages including but not limited to: loss of career opportunities; loss of fringe and pension benefits; mental anguish; anxiety about her future; physical and emotional distress; humiliation and embarrassment; loss of professional reputation; damage to her good name and reputation; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful employment of her choice.

## COUNT II
## Breach of Contract

78.    Plaintiff realleges all prior paragraphs as if they were fully set forth herein.

79.    Defendants breached their contract and agreements with Plaintiff by, among other things, failing to properly pay incentive based compensation.

80.    The contract and agreements are in the possession of Defendants.

81.    As a direct and proximate result of Defendants' breach, Plaintiff has sustained injuries including significant economic and consequential damages.

## COUNT III
## Unjust Enrichment

82.    Plaintiff realleges all prior paragraphs as if they were fully set forth herein.

16

83.     This Count is presented by way of alternative pleading if this Court finds that no express contract existed between Plaintiff and Defendants.

84.     Defendants received the benefit of Plaintiff's employment from Plaintiff without fully compensating her for the work performed.

85.     It would be inequitable to allow Defendants to retain this benefit without compensating Plaintiff for the benefit.

86.     To avoid unjustly enriching Defendants, Plaintiff should be awarded damages commensurate with the benefit provided, plus interests, costs, and reasonable attorneys' fees.

## COUNT IV
## Common Law and Statutory Conversion

87.     Plaintiff realleges all prior paragraphs as if they were fully set forth herein.

88.     Defendants wrongfully exerted a distinct act of domain over Plaintiff's earned compensation in denial of or inconsistent with Plaintiff's right in such compensation.

89.     Defendants stole, embezzled, or converted Plaintiff's earned compensation for Defendants' own use, or Defendants bought, received, possessed, concealed, or aided in the concealment of stolen, embezzled, or converted property when Defendants knew that the property was stolen, embezzled or converted.

17

90.     As a direct and proximate result of Defendants' conversion, Plaintiff has sustained injuries including significant economic and consequential damages, as well as costs and attorneys' fees.

## COUNT V
## Fraud and Misrepresentation

91.     Plaintiff realleges all prior paragraphs as if they were fully set forth herein.

92.     Defendants materially misrepresented the amount of incentive based compensation to which Plaintiff was entitled.

93.     Defendants' representations were false.

94.     Defendants knew their representations were false when they were made or their representations were made recklessly, without knowledge of their truth and as positive assertions.

95.     Defendants' representations were made with the intention to induce reliance by Plaintiff.

96.     Plaintiff acted in reliance upon the representations.

97.     As a direct and proximate result of Defendants' fraud, Plaintiff has sustained damages.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

18

**A.     LEGAL RELIEF**

     1.     Compensatory, economic and noneconomic damages in whatever amount she is found to be entitled;

     2.     A judgment for lost wages and benefits, past and future, in whatever amount she is found to be entitled; and

     3.     An award of interest, costs and reasonable attorney fees.

**B.     DECLARATORY EQUITABLE RELIEF**

     1.     An order out of this Court reinstating Plaintiff to the position she would have held had there been no wrongdoing by Defendants;

     2.     An injunction out of this Court prohibiting any further acts of discrimination or retaliation;

     3.     An award of interest, costs and reasonable attorney fees;

     4.     Whatever other declaratory and/or equitable relief appears appropriate at the time of final judgment.

Dated:  March 4, 2016          Respectfully submitted,
                          **DEBORAH GORDON LAW**

                          **/s/ <u>Deborah L. Gordon (P27058)</u>**
                          **Benjamin I. Shipper (P77558)**
                          Attorneys for Plaintiff
                          33 Bloomfield Hills Parkway, Suite 220
                          Bloomfield Hills, Michigan 48304
                          248-258-2500/FAX 248-258-7881
                          dgordon@deborahgordonlaw.com
                          bshipper@deborahgordonlaw.com

## <u>JURY DEMAND</u>

Plaintiff **Laurette Bage,** by her attorneys **Deborah Gordon Law,** demands

a trial by jury of all the issues in this cause.

Dated:  March 4, 2016

Respectfully submitted,
**DEBORAH GORDON LAW**

**/s/ <u>Deborah L. Gordon (P27058)</u>**
**Benjamin I. Shipper (P77558)**
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
248-258-2500/FAX 248-258-7881
dgordon@deborahgordonlaw.com
bshipper@deborahgordonlaw.com